UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Brian Wierimaa, | Civil No.17-3943 (FLN) |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy Berryhill,<br>Commissioner of Social Security, | |
| Defendant. | |

_____

Stephanie Balmer, for Plaintiff.
Pamela Marentette, Assistant United States Attorney, for Defendant.
_____

Plaintiff Brian Wierimaa seeks judicial review of the final decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA"), who denied his application for disability insurance benefits under Titles II and XVI of the Social Security Act. This Court has jurisdiction over the claim pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), 28 U.S.C. § 636(c), and Rule 73 of the Federal Rules of Civil Procedure. The parties have submitted cross motions for summary judgment. *See* ECF Nos. 10 and 12. For the reasons set forth below, the Commissioner's motion for summary judgment is **GRANTED**, the Commissioner's decision is **AFFIRMED**, and the case is **DISMISSED WITH PREJUDICE**.

I.  INTRODUCTION

This SSA litigation stems primarily from Wierimaa's alleged psychological impairments, his recalcitrance to explore whether he actually suffers from a bona fide psychological disorder, and whether any such disorder impacts his ability to secure and maintain competitive employment. On September 22, 2014, Wierimaa applied for disability insurance benefits

1

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, alleging a disability onset date of December 31, 2013. Administrative Record [hereinafter "AR"] 60, 143 ECF No. 9. Wierimaa's application was denied initially on November 17, 2014, and upon reconsideration on February 5, 2015. AR 69, 78. Thereafter, Wierimaa filed a written request for a hearing before Administrative Law Judge ("ALJ") Roger Thomas, which was held on April 21, 2016. AR 26–59. On May 13, 2016, the ALJ denied Wierimaa's application for DIB and SSI. AR 7–25. On July 15, 2016, Wierimaa submitted additional materials in support of his application for DIB and SSI.[1] AR 283–92. On June 26, 2017, the SSA Appeals Council denied Wierimaa's request for review, rendering the ALJ's decision final for purposes of judicial review. AR 1–6; *see* 20 C.F.R. § 404.981. On August 25, 2017, Wierimaa commenced this action, seeking an award of benefits, or alternatively, remand for further proceedings pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *See* ECF No. 1.

## II. FACTUAL FINDINGS

### A. Background

Wierimaa was nearly fifty-seven years old on his alleged disability onset date. AR 60. In his application for DIB and SSI, Wierimaa claims that the following medical conditions impair his ability to secure and maintain competitive employment: tendonitis in his feet and ankles, and vertigo. AR 190.[2] Wierimaa's past relevant work includes employment as a janitor for a cleaning company. AR 182.

---

1    The material included additional argument and literature addressing the effects of hypochondriasis on daily living. AR 283–92.

2    The medical record shows that Wierimaa received assorted treatments for back pain, gastroesophageal reflux disease, dermatitis, sleep disorder, vertigo, and a left eye condition; however, Wierimaa concedes that these conditions are not severe impairments. *See* ECF No. 11 at 3.

**B. Hearing Testimony**

Wierimaa testified on his own behalf at the April 21, 2016, administrative hearing. AR 30–56. Wierimaa was represented by an attorney at the hearing, Stephanie Balmer. AR 30. Wierimaa testified that he has an eleventh grade education and does not know how to properly use a computer. AR 32. He testified that he is not married, does not have children, and has lived alone in the same house since his parents died, ultimately inheriting the house from them. AR 31. Wierimaa testified that he has a driver's license and receives $194 a month in food assistance. *Id.* He testified that he earns income from a tenant who rents the bottom floor of his home. AR 43.

Wierimaa testified that he was fired from his last job as a janitor for not being fast enough, often needing assistance, and poor general performance. AR 45. Wierimaa testified that he briefly worked as a telemarketer after being fired from his janitorial position. AR 38. He also testified that he is currently looking for work as a janitor. *Id.*

Wierimaa stated that he experiences vertigo in the winter, which stops him from exercising regularly. AR 34. He testified that he was regularly walking and riding a stationary bicycle for exercise and shoveling snow in the winter. *Id.* Wierimaa stated that he can take care of himself and is capable of bathing, dressing, and preparing meals. AR 35. He testified that he is now only exercising about once a week. AR 49.

Wierimaa testified that he often smells gas in his basement, which causes him to wear a respirator. AR 36. He stated that he uses a microwaved hot towel to apply shampoo to clean his eye lashes because he believes he suffers from an eye disorder. AR 41. He also stated that he packs several layers and changes of clothes to accommodate weather changes when he leaves his home, and because he sweats a lot. *Id.* He testified that he often has trouble getting a proper amount of sleep, AR 48, and that his eye routine and clothing preparation take a long time. AR

50. Wierimma testified that he rarely leaves his home, goes out or to the movies, or publically socializes. *Id.*

Wierimaa testified that although he was instructed to obtain mental health treatment and evaluation, he does not believe treatment or further evaluation is necessary, and he believes he is fine and doing well. AR 49. As to the respirator, Wierimaa testified that he has to wear it even when going outside because it improves his vertigo symptoms and helps him avoid harmful auto and lawnmower exhaust. AR 52. He stated that his eye-wash routine takes him a long time because his house is often cold and he has to microwave his towel several times. AR 50. He testified that if the towel is to hot, he has to wear multiple sets of rubber gloves to handle the towel. *Id.*

Vocational expert ("VE") Kenneth Ogren, also testified at the hearing. AR 54. The VE testified that Wierimaa could perform his past work as a janitor, but would be limited to working in that capacity on night or afternoon shifts. AR 56. The VE opined that 6,300 of those janitorial jobs exist in Wisconsin and Minnesota. AR 57. The VE also opined that if a company had more restrictive policies regarding an employee that hypothetically brought several additional sets of clothing to wear, the number of available janitorial jobs would be reduced by a third. *Id.* The VE finally opined that a person of Wierimaa's age and education would only be permitted to nap during their lunch break, and if additional naps or breaks were needed, they would be precluded from work as a janitor. AR 58.

C. **Medical Evidence**

On April 13, 2013, Wierimaa was treated by Mostafaa Farache, M.D., for fatigue and dizziness. AR 370. Wierimaa reported a sense of imbalance, feeling lightheaded, and spinning that had been intermittent for several years. *Id.* Farache noted that it was possible that

Wierimaa's irregular sleep patterns contributed to his dizziness symptoms. AR 372. Farache also observed that Wierimaa had been suffering from the same symptoms for a few years, but his neurological exam was "essentially unremarkable." *Id.* Farache advised Wierimaa that he did not know for certain what was causing his symptoms, and that Farache believed that it would be advisable for Wierimaa to get an image test of his brain to rule "out any slow growing tumors . . . ." *Id.* Farache opined that if image testing was negative, he believed that Wierimaa needed to be evaluated "for any inner ear problems . . . ." *Id.*

On May 8, 2013, Wierimaa received a physical and mental work-up at Essentia Health. AR 365–80. Betsy Schutte, Au.D., found that Wierimaa's balance was normal and found no specific cause or presence of vertigo, dizziness, tinnitus in the ear, or fatigue. AR 380. David Alexander, M.D., performed image testing of Wierimaa's brain, which found no evidence of structural abnormality. AR 377. Julie Szendrey, a licensed physical therapist, found that Wierimaa's gait was normal and that he could ambulate quickly if needed. AR 365. She also found that Wierimaa had no difficulty with smooth pursuit, saccades, or gaze stabilization trials with no change in his symptoms. *Id.* Szendrey also noted that Wierimaa claimed that he could feel "something" when he turned his head quickly, but he described his symptoms as "not really dizziness." *Id.* Szendrey opined that she was not certain "what is causing [Wierimaa's] symptoms, and his episode could not be reproduced with movement . . . [and at that time] no further physical therapy [was] recommend, as [Wierimaa] appeare[d] to be functioning at a normal level for gait and balance skills." *Id.*

From May 13, 2013, through October 14, 2013, Wierimaa was examined at St. Luke's Hospital and was treated with Meclizine for positional vertigo. AR 293–302. On June 17, 2013, Wierimaa's treating physician, Craig Gilbertson, M.D., noted that some of Wierimaa's providers

at St. Luke's were concerned about his mental health because he had previously had a negative evaluation and appeared antisocial and compulsive. AR 296. Gilbertson noted that Wierimaa denied suffering from anxiety or from any mental health disorder, and that he felt persecuted by his providers. *Id.* On October 14, 2013, Gilbertson opined that there were no evident causes for Wierimaa's vertigo and offered instruction on Dix-Hallpike maneuvers. AR 305.

On February 5, 2014, Katherine Beresford, M.D., treated Wierimaa for a sleep disorder. AR 350. Wierimaa reported that he was feeling better after the treatment and was pleased with his overall sleep disorder progress. *Id.* Beresford encouraged Wierimaa to get sufficient sleep and recommended sleep aides if necessary. AR 351.

On April 11, 2014, and May 6, 2014, Megan Ceynowa, N.P., a psychiatric provider at St. Luke's, performed clinical assessments of Wierimaa. AR 581–86. Ceynowa noted that St. Luke's "nuerology and sleep medicine strongly encouraged a referral to psychiatry due to what was perceived as obsessive compulsive behaviors." AR 583. Ceynowa noted that Wierimaa believed that he needed several layers of clothes to protect his skin. *Id.* Ceynowa noted that Wierimaa does not believe that he needs medication for mental health disorders, but would be open to taking them if recommended. AR 584. Ceynowa found that Wierimaa's attention and concentration "were good." AR 585. Ceynowa opined that Wierimaa's fund of knowledge was consistent with his level of education, his speech was clear, and regular and his recent and remote memory was intact. *Id.* Ceynowa "did not notice any stereotyped or repetitive mannerisms . . . [and was] hesitant to initiate medications at th[at] point without having a more clear diagnostic path which may lead to therapeutic intervention versus medications." *Id.*

On June 3, 2014, Latina Else, Ph.D., also of St. Luke's, performed a clinical assessment of Wierimaa. AR 580. Else opined that Wierimaa suffers from borderline intellectual functioning

6

disorder and schizoid and schizotypal personality style. *Id.* Else also opined that Wierimaa "best meets the criteria for hypochondriasis." *Id.* Else also stated that Wierimaa is not likely to "hear anyone else" besides Gilbertson "providing him any education and [direction]." *Id.*

On September 26, 2014, Wierimaa completed an SSA function report. AR 197. Wierimaa reported needing to take breaks due to veritigo and dizziness and feeling weak after working for "awhile." *Id.* Wierimaa reported having no specific concerns or challenges maintaining attention or following instructions. *Id.* He reported being able to bathe and cook meals, paint his house on occasion, and talking on the telephone once or twice a month. AR 201.

On October 31, 2014, Marlin Trulsen, Ph.D., L.P., performed an SSA consultative examination of Wierimaa. AR 466. Trulsen evaluated Wierimaa's alleged schizoid personality disorder, schizotypal personality disorder, and borderline intellectual functioning disorder. *Id.* Trulsen noted that Wierimaa appeared groomed and with appropriate hygiene. *Id.* Trulsen also noted that Wierimaa claims he never suffered from schizotypal problems, neither in his past nor at the time of his examination. *Id.* Wierimaa also reported no current or history of counseling services or medications to help with mood or behavior. AR 467.

Trulsen opined that Wierimaa's frustration tolerance appeared developed at expected levels. *Id.* Trulsen found Wierimaa oriented and maintaining good eye contact. *Id.* Wierimaa appeared to have an adequate general memory and long-term memory, sufficient for daily living. *Id.* Trulsen estimated that Wierimaa's overall IQ was normal, and his general use of language was average. AR 468. Trulsen stated that Wierimaa was independently active with house projects, painting, repairing his porch, doing yard work, and doing his own cleaning, dishes, cooking, laundry, raking, shoveling, and shopping. AR 467. Trulsen opined that Wierimaa demonstrated adequate concentration abilities when completing serial seven subtraction tests

without making any errors, recalling three of three objects after five and thirty minutes, and restating six digits forward and four digits backwards. AR 468.

Trulsen opined that Wierimaa's mental capacity for understanding, remembering, following instructions, sustained attention, concentrating, and carrying out tasks with reasonable persistence and pace were slightly impaired due to autistic type features, which likely result in Wierimaa experiencing information somewhat differently than others. AR 469. Trulsen also found that Wierimaa's capacity for responding to superficial contact with coworkers and supervisors was slightly impaired, and his general mental capacity for tolerating stress was slight to moderately impaired. *Id.*

On November 17, 2014, Clifford Phibbs, M.D., performed an SSA consultative examination of Wierimaa. AR 64. Phibbs noted that Wierimaa complained of vertigo, but observed that his brain scan was negative, his balance assessment was normal, his neurological assessment was normal, and his audiogram showed only moderate right hearing loss at high frequencies. *Id.* Phibbs opined that Wierimaa had a possible mental diagnosis of hypochondriasis, but evidence suggested that this was a non-severe impairment. *Id.*

On March 11, 2016, Gilbertson contacted Wierimaa's attorney, Balmer. AR 576. Gilbertson stated that Wierimaa "is actually quite a physically healthy man[,]" but he was concerned for his "psychological well-being." *Id.* Gilbertson stated that he did "not have a specific diagnosis for" Wierimaa, but he noted that "there was concern voiced that [he] had some distinct hypochondriasis, that he may have schizoid personality disorder, a schizotypal personality disorder and borderline intellect." *Id.* Gilbertson also stated that he has "wondered if [Wierimaa] suffered from an undiagnosed, and therefore, untreated autism spectrum disorder as

8

well." *Id.* Gilbertson stated that Wierimaa has resisted evaluation and it was Gilbertson's impression "that [Wierimaa] is not employable[,]" and that he is "mentally disabled." *Id.*

**D. The Commissioner's Decision**

On March 10, 2016, the ALJ issued a decision denying Wierimaa's application for DIB and SSI benefits. AR 7–25. In determining that Wierimaa was not disabled, the ALJ followed the five-step sequential process established by the SSA, outlined in 20 C.F.R. 404.1520(a) and 416.920(a).

The first step is to consider whether the claimant's work during the alleged disability period qualifies as substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant has performed substantial gainful activity, he is not disabled. *Id.* At step one, the ALJ found that Wierimaa has not engaged in substantial gainful activity since his alleged onset date. AR 12.

The second step is to determine whether the claimant has an impairment or combination of impairments that significantly limits his physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step two, the ALJ found that Wierimaa suffered from the following severe impairments: hypochondriasis, personality disorder with obsessive behaviors, and borderline intellectual function. AR 12. The ALJ noted that this determination is "consistent with the findings of a single psychological evaluation in the absence of any mental health treatment of diagnoses." *Id.* However, the ALJ gave Wierimaa the benefit of all reasonable doubt and "depart[ed] from the finding of no severe impairments by the state agency psychological consultants." *Id.*

The third step is to determine whether the claimant has an impairment that meets or equals one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§

9

404.1520(d), 404.1525, 404.1526; 416.920(d), 416.925, 416.926. At step three, the ALJ determined that Wierimaa did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1. AR 13. In reaching his step-three determination, the ALJ considered listing 12.02 (neurocognitive disorders), 12.07 (somatic symptom and related disorders), and 12.08 (personality and impulse-control) criteria. *Id.*

If the claimant's impairments fail to meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of the claimant's Residual Functional Capacity ("RFC"). Here, the ALJ concluded that Wierimaa had the "[RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: unskilled shift work." AR 14. In making this RFC determination, the ALJ found "that [Wierimaa's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." AR 15.

The fourth and fifth steps determine whether the claimant has the RFC to perform either past relevant work or any other job that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g). If the claimant can still perform his past relevant work, then he is not disabled. *Id.* If the claimant cannot perform his past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

At step-four, the ALJ concluded that Wierimaa was "capable of performing [his] past relevant work as a janitor . . . . This does not require the performance of work-related activities precluded by [his RFC] . . . ." AR 21. The ALJ's step-four determination was based in part on

the VE's testimony, which the ALJ found consistent with the Dictionary of Occupational Title. AR 22. Because the ALJ found that Wierimaa was capable of performing his past relevant work, he made no step-five finding, and found that Wierimaa was not disabled under the Social Security Act. *Id.*; *see also* 20 C.F.R. 404.1520(f).

## III. STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the SSA means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled under the SSA "if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §423(d)(2)(A).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999);

*see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468 (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* Therefore, this Court's review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV.     ANALYSIS

Wierimaa raises two global arguments. First, he argues that the ALJ erred by: (1) not developing the record with respect to his psychological impairments; (2) assigning improper weight to his lack of psychological treatment. ECF No. 11 at 12. Second, Wierimaa argues that substantial evidence does not support the ALJ's step-three finding that he did not meet listing 12 criteria, or the ALJ's step-four finding that Wierimma could perform janitorial shift work. *Id.* The Commissioner counters that the ALJ properly found that he did not meet listing 12 criteria that he could perform shift work as a janitor, and properly considered Wierimaa's lack of mental

health treatment. *See generally* ECF No. 13. Because substantial evidence in the record as a whole supports the ALJ's decision denying Wierimaa's application for DIB and SSI, this Court affirms.

### A. The ALJ Properly Developed the Record and Weighed Wierimaa's Lack of Psychological Treatment

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). However, an ALJ is not required to seek clarifying documents or opinions unless a crucial issue is underdeveloped. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

Wierimaa argues that the ALJ erred by failing to develop a proper record as to his psychological impairments and treatment, and in assigning improper weight to his lack of psychological treatment. ECF No. 11 at 15. In support, Wierimaa proffers Social Security Regulation ("SSR") 82-59, 1982 WL 31384, at *2 (Soc. Sec. Admin. Jan. 1, 1982), which provides, in relevant part:

> [w]here the treating source has prescribed treatment clearly expected to restore ability to engage in any [substantial gainful activity ("SGA")] (or gainful activity, as appropriate), but the disabled individual is not undergoing such treatment, appropriate development must be made to resolve whether the claimant or beneficiary is justifiably failing to undergo the treatment prescribed . . . . A full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable.

Here, there is no treating source that has prescribed treatment "*clearly expected to restore*" Wierimaa's ability to engage in SGA. *Id.* Gilbertson, Wierimaa's treating physician, stated that he "did not have a specific diagnosis for" Wierimaa, and that he merely "wondered if [Wierimaa] suffered from an undiagnosed, and therefore, untreated autism spectrum disorder as well." AR 576. Indeed, the record is replete with Gilbertson expressing general concern about Wierimaa's

psychological impairments, but not offering concrete diagnosis or plan of treatment. At best, the record shows that Wierimaa was advised to seek additional evaluation for his psychological impairments, but that he either failed to follow that counsel or refused to do so. Gilbertson's general concern, without an actual diagnosis or concomitant treatment plan to restore Wierimaa to SGA, is far too attenuated for this Court to conclude that the ALJ was required to further develop the record under the applicable regulation, SSR 82-59.

Furthermore, this Court finds that the record is not underdeveloped as to Wierimaa's psychological impairments or disorders. Numerous medical sources, including Wierimaa's treating physician, Gilbertson, have examined his alleged psychological disorders either clinically or through image testing; however, no diagnosis or treatment plan has been established nor found to be needed, nor has any specific abnormality been found. To the extent Wierimaa has declined or refused psychological treatment or evaluation, he offers no source of law showing that his refusal results in an underdeveloped record necessitating remand. Put differently, that Wierimaa declined or refused evaluation, which could have potentially augmented the record in support of his claim, does not support a finding that the record is underdeveloped. AR 283–92. To that end, the ALJ has satisfied his responsibility to "develop the record fairly and fully." *Snead*, 360 F.3d at 838.

**B. Substantial Evidence Supports the ALJ's Step-Three and Step-Four Findings**

Wierimaa argues that substantial evidence does not support the ALJ's step-three finding that he did not meet a listing 12 criteria, ECF No. 11 at 13, and that he could perform janitorial shift work. ECF No. 11 at 17. The Commissioner argues that substantial evidence supports the ALJ's decisions. *See generally* ECF No. 14. This Court agrees.

At step three, the claimant carries the burden of proving their impairment meets the relevant listing criteria. *See, e.g., Lewis v. Barnhart*, 353 F.3d 642, 648 (8th Cir. 2003) (explaining the claimant's burden during the first four steps of the sequential process). "Each [listing] impairment is defined in terms of . . . specific medical signs, symptoms, or laboratory test results . . . ." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "[A] claimant . . . must meet *all* of the specified . . . criteria. An impairment that manifests only some . . . criteria, no matter how severely, does not qualify." *Id.* (emphasis is the original). The ALJ makes the determination of whether a claimant satisfies an Appendix 1 listing based on the record as whole. *See Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2004).

Wierimaa argues that "it is undipstued that [he] suffers from a number of psychological conditions." ECF No. 11 at 15. However, far from an undisputed record, the exact cause of Wierimaa's psychological conditions and whether he actually, and to what extent, he suffers from a severe psychological impairment is not established. Indeed, Gilbertson opined that he "*did not have a specific* diagnosis for" Wierimaa, and noted that "there was *concern* voiced that [he] had some distinct hypochondriasis . . . schizoid personality disorder, [and] schizotypal personality disorder and borderline intellect." AR 576 (emphasis added). The AJL reasoned that it was this lack of evidence of a psychological disorder that prompted concern for Wierimaa's well-being. AR 20. For example, the ALJ noted that having "ruled out severe phsycial impairments to explain" Wierimaa's symptomology, Gilbertson "and other providers suspected mental health etiology." AR 18. The ALJ gave great weight to Gilbertson's admission that there is no specific diagnosis or finding of possible schizoid personality disorder, schizotypal personality disorder, and borderline intellectual function, and that those disorders were not supported by the objective medical evidence. AR 20.

In addition, Ceynowa, like Gilbertson "did not notice any stereotyped or repetitive mannerisms . . . [and was] hesitant to initiate medications at this point without having a more clear diagnostic path which may lead to therapeutic intervention versus medications." AR 585. In addition, Alexander's image testing of Wierimaa's brain found no evidence of abnormality. AR 377. Szendrey similarly opined that she was not certain "what is causing [Wierimaa's] symptoms, and his episode could not be reproduced with movement . . . [and at that time] no further physical therapy [was] recommend, as [Wierimaa] appeare[d] to be functioning at a normal level for gait and balance skills." AR 365. In the absence of any image testing or objective finding supporting a severe psychological impairment, the ALJ properly declined to hold that a general concern for Wierimaa's psychological health satisfied the specific strictures of the relevant listing 12 criteria. *See Zebley*, 493 U.S. at 530.

In addition, the ALJ noted the opinions of the SSA consultative examiners and incorporated their impairment findings into his decision; however, in doing so, he gave "all reasonable doubt to" Wierimaa, and dismissed their findings regarding no severe impairments. AR 20. Trulsen found that Wierimaa's capacity for understanding, remembering, following instructions, sustained attention, concentrating, and carrying out tasks with reasonable persistence and pace was slightly impaired; his capacity for responding to superficial contact with coworkers and supervisors was slightly impaired; and his general mental capacity for tolerating stress were slight to moderately impaired. AR 466.

Trulsen, like Gilbertson and Ceynowa found no specific psychological impairment. In fact, Trulsen opined that Wierimaa's frustration tolerance appeared developed at expected levels, and Wierimaa was oriented and maintained good eye contact. *Id.* Trulsen estimated that Wierimaa's overall IQ was normal, and his general use of language was average. AR 468.

Trulsen stated that Wierimaa was independently active with house projects, painting, repairing his porch, doing yard work, and doing his own cleaning, dishes, cooking, laundry, raking, shoveling, and shopping. AR 467. Trulsen also opined that Wierimaa demonstrated adequate concentration abilities. *Id.*

Similarly SSA consultative examiner Phibbs noted that although Wierimaa complained of vertigo, his brain scan was negative, his balance assessment was normal, his neurological assessment was normal, and his audiogram showed only moderate right hearing loss at high frequencies. AR 64. In combination, Gilbertson, Ceynowa, Alexander, Szendrey, Trulsen, and Phibb's findings demonstrate a record, which suggests some psychological impairment, but falls considerably short of objectively establishing the requisite symptom typology, severity, duration, or limiting effects needed to satisfy listing 12 level criteria. As such, substantial evidence in the record as a whole supports the ALJ's listing 12 level criteria. *See Cox*, 495 F.3d at 619.

Wierimaa also argues that the ALJ erred in finding that he could perform his past relevant work as a shift janitor. ECF No. 11 at 17. Specifically, Wierimaa challenges the ALJ's finding that he could work afternoon and night shifts. *Id.* Wierimaa states that the "record shows multiple visits to sleep specialists and other medical experts who note the disruptive nature of [his] fatigue and the impact it has had on his everyday functioning." *Id.* Wierimaa, however, concedes that his sleep disorder is not a severe impairment. *See* ECF No. 11 at 3. Moreover, there is no evidence in the record showing that his sleep disorder, when treated, would cause work impairments for a sustained period of twelve months or more. For example, on February 5, 2014, Beresford treated Wierimaa for sleep issues and he reported that he was feeling better after sleep treatments and he was pleased with his overall sleep disorder progress. *Id.* Beresford encouraged Wierimaa to get sufficient sleep and recommended sleep aides if necessary. AR 351.

This Court's review of the ALJ's factual determination is deferential, and it neither reweighs the evidence, reviews the factual court *de novo*, *see Flynn*, 107 F.3d at 620, nor reverses when an ALJ's decision falls within a reasonable "zone of choice." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Because the ALJ's conclusion that Weirmma could perform his past relevant janitorial work at step-four was based on a sufficient examination of the record, this Court concludes that substantial evidence exists to support the ALJ's finding of non-disablity under the Social Security Act. *See id.*

## V. CONCLUSION

If the ALJ's decision is supported by substantial evidence on the record, this Court cannot reverse simply because "substantial evidence exists in the record that would have supported a contrary outcome…or because we would have decided the case differently." *Roberts*, 222 F.3d at 468. Here, substantial evidence supports the ALJ's findings and weighing of the medical opinions. Accordingly, this Court affirms the ALJ's decision denying Wierimaa's applications for DIB and SSI, and grants the Commissioner's motion for summary judgment.

Based upon the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Wierimaa's motion for summary judgment (ECF No. 10) is **DENIED**;

2. The Commissioner's motion for summary judgment (ECF No. 12) is **GRANTED**;

3. The Commissioner's decision is **AFFIRMED** and the case is **DISMISSED WITH PREJUDICE**. **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 3, 2018               *s/Franklin L. Noel*
                                    FRANKLIN L. NOEL
                                    United States Magistrate Judge